CARGILL, INC., Appellant,

v.

John FICKBOHM, Appellee.

No. 2–58067.

Supreme Court of Iowa.

April 20, 1977.

Maynard M. Mohn, Rosendahl, Forsyth & Mohn, Estherville, for appellant.

Fitzgibbons Brothers by Leo E. Fitzgibbons and Harold W. White, Estherville, for appellee.

Heard by MOORE, C. J., and MASON, UHLENHOPP, HARRIS and McCOR-MICK, JJ.

UHLENHOPP, Justice.

This appeal involves the sufficiency of the evidence on damages in a jury-waived law action.

Viewing the evidence in the light most favorable to plaintiff Cargill, Inc., Rule 344(f)(2), Rules of Civil Procedure, the trier of fact could find that by telephone on November 30, 1972, the wife of defendant John Fickbohm, purporting to act for him, sold Cargill's Emmetsburg elevator 10,000 bushels of corn at $1.26 per bushel for delivery in June or July 1973, with defendant himself later to select June or July for delivery. Cargill hedged this purchase by selling a futures option of 10,000 bushels at $1.39 per bushel.

Cargill's assistant manager at Emmetsburg accordingly made out a contract form in triplicate between Cargill and Fickbohm for 10,000 bushels of No. 2 corn at $1.26 per bushel. He purposely left the delivery date blank because of defendant's option to deliver in either June or July 1973. The first sheet was marked for Cargill's Minneapolis office, and the assistant manager had to send it there promptly. He did so the same day, after signing it in Cargill's behalf and inadvertently writing in a delivery date, "Between 6/30/73 and 7/31/73" (instead of 6/1/73 and 7/31/73). Defendant did not sign this sheet.

Shortly afterward, on December 4, 1972, defendant came to Cargill's Emmetsburg elevator. The elevator manager testified regarding his conversation with defendant:

Q. Okay, would you relate any conversation that took place at that time when he came in three or four days later? A. Well, we told John that we bought 10,000 bushels, which he knew, from his wife. And he told me not to buy—

Q. Did he say that, or how did you know he knew? A. He said we bought 10,000.

Q. Okay; what else did he say, if anything? A. He told me not to buy any more grain from his wife in the future.

The respective second and third sheets of the contract, which were together, were for the owner of the grain and for the elevator. They did not bear the delivery date. Defendant looked at the contract. The manager told him he could deliver in June or July. Defendant signed the sheet for the owner, and his signature traced through

onto the sheet for the elevator. The manager testified:

Q. Did he say he was not going to honor this contract? A. No.

Q. He, in fact, signed the contract? A. Right.

Also:

Q. Do you recall whether or not there was any conversation as to delivery date of the corn in question? A. I'm sure I told him he could deliver it either in June or July. Before he signed it.

Defendant took the signed sheet for the owner of the grain. At some time thereafter, someone at the elevator filled in the delivery date "Between 6/1/73 and 7/31/73" on the sheet for the elevator. Defendant's sheet did not bear the delivery date.

The contract contained this clause:

Seller agrees to pay Buyer as damages for default in delivery hereunder the difference between the above specified price and the highest market price at the delivery point for the same grade and kind of grain on the day of default.

On December 19, 1972, defendant came to the elevator and asked "how much it would take to cancel his contract." The manager calculated the cost at that time at $500, and defendant said he would not pay $500. Nothing came of the negotiation.

Defendant did not deliver the corn in June 1973. On July 21, 1973, defendant still not having delivered, the elevator manager sent him a Past Due Contracts form that the corn was due July 31, 1973. Defendant still did not deliver. On August 8, 1973, the manager telephoned defendant's home. Defendant was not there and the manager talked to defendant's wife about delivery. She said she would tell defendant, but defendant did not deliver.

The manager thereafter marked Cargill's copy of the contract canceled, and Cargill brought this action against defendant for damages.

By evidence received at trial and by three offers of proof at trial after adverse rulings by the trial court, Cargill showed that the market price of No. 2 corn at Emmetsburg on July 31, 1973, was $2.49 per bushel for corn for sale by the elevator and 4¢ less, or $2.45, for corn for purchase by the elevator.

At the conclusion of Cargill's evidence defendant moved for a directed verdict (motion to dismiss) on several grounds including failure of Cargill to adduce substantial evidence of damages. The trial court sustained the motion on the latter ground. Cargill appealed. Cargill's statement of issues presented in the appeal actually amounts to a challenge of the trial court's adverse rulings on the damage evidence and on the motion for directed verdict.

I. The ultimate issue before us is whether substantial evidence of recoverable damages appears in the evidence Cargill introduced or in admissible evidence it proffered. The first question we must resolve, viewing the evidence introduced and admissible evidence proffered in its most favorable light to Cargill, is what the time of delivery was.

In the writings signed by defendant the space for the delivery date was blank. But the trier of fact could find from the discussions between defendant's wife and the assistant manager and between defendant himself and the manager that delivery was to be in June or July 1973— whichever of those two months defendant chose. A contract may thus be partially written and partially oral. *Golwitzer v. Hummel,* 201 Iowa 751, 753, 206 N.W. 254, 255 ("We are committed in this state to the rule that a contract may be partially in writing and partially in parol."); Restatement, Contracts 2d § 242, Illustration 6 (Tent. Drafts 1–7); 17 Am.Jur.2d Contracts § 68 at 407; 17 C.J.S. Contracts § 59 at 729. See also Code 1975, § 554.2204(3). We note parenthetically that the omission of the delivery date in the writing does not involve a statute of frauds problem, in view of the last sentence of § 554.2201(1), Code 1975 ("A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.").

The fact finder could find that defendant thus had until July 31, 1973, to deliver, and that he became in default that day. *Harris & Roberts v. Morgan*, 62 Iowa 112, 17 N.W. 195.

■ II. The second question relates to the amount of Cargill's recoverable damages resulting from defendant's default, again viewing the evidence introduced and the admissible evidence proffered in its most favorable light to Cargill. The fact finder could find that on July 31, 1973, Cargill learned that defendant was not going to deliver in June or July 1973 in accordance with the agreement. The witness on market value of corn at Emmetsburg was the elevator manager. The evidence abundantly qualified him to testify on the subject. His testimony, introduced and proffered, was that the market price on July 31, 1973, was $2.49 for corn for sale by the elevator and $2.45 for corn for purchase.

A buyer's usual remedy for nondelivery is set forth in § 554.2711(1) of the Uniform Commercial Code, which provides in pertinent part:

> Where the seller fails to make delivery . . . the buyer may cancel and . . . may . . . recover damages for nondelivery as provided in this Article . . . .

Under § 554.2713(1), a buyer's usual measure of damages for nondelivery

> is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (section 554.2715), but less expenses saved in consequence of the seller's breach.

■ The measure of damages which would normally apply here, then, is the difference between the per-bushel contract price and the market price of corn for purchase by the elevator at the time it learned defendant was not going to deliver in accordance with the agreement—which the fact finder could find was July 31, 1973. The Commercial Code draftsmen state in Comment 1 to § 554.2713, I.C.A.: "The gen-

eral baseline adopted in this section uses as a yardstick the market in which the buyer would have obtained cover had he sought that relief." See also *International Harvester Co. v. Chicago, M. & St. P. Ry.*, 186 Iowa 86, 109, 172 N.W. 471, 480 ("the difference, if any, between the contract price and the price at which logs could, by reasonable diligence, have been procured elsewhere"). Cargill proffered substantial admissible evidence that the per bushel market price of corn for purchase was $2.45 on July 31, 1973.

Section 554.2713(1) requires deduction of expense saved, but none appears here.

■ Section 554.2713(1) also allows consequential damages as provided by § 554.-2715. In this connection, the market price of corn for sale by the elevator on July 31, 1973, was $2.49 per bushel. Cargill seeks the difference between the per-bushel contract price of $1.26 and the market price of $2.49 for corn for sale (as distinguished from $2.45) or an additional 4¢ per bushel. Here Cargill is actually trying to recover as consequential damages its gross profit on grain of 4¢ per bushel, but it has not shown the net profit. Neither has it shown that it could not have covered, which is a condition to recovery of such consequential damages by reason of § 554.2715(2)(a). See 2 Anderson, Uniform Commercial Code, § 2–715:22 at 476, § 2–715:26 at 478 (2d ed.). The normal difference of $1.26 and $2.45 per bushel thus applies, and substantial proffered evidence supports such damages.

■ III. The parties advance several contentions in which we do not find merit. The liquidated damage clause does not come into play here, as Cargill did not show a higher market price for corn for purchase on July 31, 1973, than the regular market price of $2.45 as provided by the statute. Hence we have no occasion to consider that clause in the contract.

Cargill could recover its normal damages without covering, since § 554.2711(1) gives that option (use of disjunctive "or"). See also § 554.2712(3).

Cargill's manager did not testify to mere offers, as in *Morril v. Bentley,* 150 Iowa 677, 130 N.W. 734. He presented substantial testimony as to market price.

Cargill could recover damages although it hedged its purchase by selling 10,000 bushels on the futures exchange. That transaction is of no concern to defendant. Anyway, Cargill would have to buy itself out of its short position and do so at the advanced price of corn.

The trial court erred in refusing Cargill's proffered evidence on the market price of corn for purchase and in sustaining defendant's motion for directed verdict. Cargill is entitled to another trial.

REVERSED.